IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOAN O'MEARA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DAVE HEINEMAN, et al. <br><br> Defendants. | 8:09CV157 <br><br><br> **MEMORANDUM AND ORDER** |
| CLAUDIE SIRES, Personal Representative of the Estate of Claudia Wright, <br><br> Plaintiff, <br><br> v. <br><br> DAVE HEINEMAN, et al., <br><br> Defendants. | 4:10CV3020 |
| GARRY WHEELER, Personal Representative of the Estate of Sara Schnell, <br><br> Plaintiff, <br><br> v. <br><br> DAVE HEINEMAN, et al. <br><br> Defendants. | 4:10CV3021 |

This is an action brought by court-appointed guardians of developmentally-disabled individuals. Plaintiffs claim that their protected persons were victimized by Defendants when Defendants allowed Beatrice State Developmental Center ("BSDC") to deteriorate into a substandard facility and then, rather than fixing the problems at BSDC, removed their protected persons from the facility with little or no advance notice. (Filing 19, Case No. 8:09CV157; Filing 1, Case No. 4:10CV3020; Filing 1, Case No. 4:10CV3021.) Plaintiffs seek redress under 42 U.S.C. § 3601, governing housing, and 42 U.S.C. § 1983, governing deprivations of rights, privileges or immunities secured by the Constitution and the laws of the United States and the State of Nebraska. Plaintiffs are alleging violations of the equal protection, due process, privileges and immunities clauses of the Fourteenth Amendment of the United States Constitution; the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997; the Federal Fair Housing Act; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; the equal protection clause of the Nebraska Constitution and the Nebraska Developmental Disabilities Services Act, Neb. Rev. Stat. § 83-1201, *et seq.*.

Defendants, who are sued in their individual capacities, have filed the instant motion for summary judgment arguing that Plaintiffs' § 1983 claims are barred by the comprehensive remedial scheme provided by the ADA and, additionally, that they are entitled to qualified immunity. (Filing 55, Case No. 8:09CV157; Filing 26, Case No. 4:10CV3020; Filing 25, Case No. 4:10CV3021.) For the reasons set forth below, Defendants' motion for summary judgment will be granted.

## *FINDINGS OF FACT*

The court finds that these facts are uncontroverted for purposes of this summary judgment motion.[1]

---

[1] Where appropriate and unless otherwise specified, citations to the record will be to the filings in Case No. 8:09CV157, the lead case in these consolidated

1. Plaintiffs are guardians, occupying court-appointed positions, on behalf of persons with special needs for legal protection who are incompetent to attend to their affairs. (Filing 19, Case No. 8:09CV157; Filing 1, Case No. 4:10CV3020; Filing 1, Case No. 4:10CV3021.)

2. Defendant David Heineman ("Governor Heineman") is the Governor of the State of Nebraska. Governor Heineman is responsible for overseeing the Nebraska Department of Health and Human Services ("DHHS"), which administers and supervises BSDC, a duly licensed Intermediate Care Facility for the Mentally Retarded ("ICF-MR"). (Filing 59-3 at CM/ECF p. 2.)

3. Defendant Joann Schaefer, ("Dr. Schaefer") is the Chief Medical Officer for the State of Nebraska. Dr. Schaefer also serves as the Director of the Division of Public Health of DHHS. As the Director of DHHS, Dr. Schaefer is responsible for administering the regulation and licensure of public and private health care facilities in the State of Nebraska, including ICF-MRs. (Filing 59-1 at CM/ECF pp. 2-3.)

4. Defendant Ron Stegemann ("Stegemann") was employed by DHHS from September, 1989 to September, 2009. From October, 2007 through December, 2009, Stegemann was the Chief Executive Officer of BSDC. In January of 2009, Stegemann became the Chief Operating Officer at BSDC assisting the then senior administration official at BSDC, John Wyvill, in the day-to-day operation of the facility. (Filing 59-4 at CM/ECF pp. 2-3.)

5. Defendant John Wyvill ("Wyvill") was the Director of the Division of Developmental Disabilities within DHHS from September 17, 2007 to

---

actions.

3

        July 2, 2009. As Director, Wyvill was responsible for the administration of the state developmental disability programs in Nebraska and the administration of BSDC. Wyvill was also responsible for the budgets associated with these programs and facility. In January of 2009, Wyvill became the senior administration official at BSDC. (Filing 59-5 at CM/ECF pp. 2-7.)

6.     BSDC was established pursuant to Neb. Rev. Stat. § 83-218 and founded in 1887 as a home for the mentally infirm. BSDC is licensed as a ICF-MR by the Division of Public Health of DHHS. All of the residents of BSDC are voluntary admissions with natural or legal guardians. (Filing 59-5 at CM/ECF p. 3.)

7.     In October of 2007, the United States Department of Justice ("DOJ") conducted an onsite review at BSDC under their authority as provided by the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. The review conducted by the DOJ identified issues at BSDC which impacted the facility's eligibility for federal Medicaid funding. (Filing 59-3 at CM/ECF p. 3.)

8.     In 2008, BSDC also came under scrutiny by the Centers for Medicare and Medicaid Services ("CMS"), an arm of the United States Department of Health and Human Services that oversees the states' administration of the Medicaid program. CMS sent in teams of surveyors to review BSDC for compliance with state and federal requirements. CMS also identified issues at BSDC which impacted the facility's eligibility for Medicaid funding. (Filing 59-3 at CM/ECF p. 3.)

9.     In response to the issues raised by DOJ and CMS, DHHS seemingly sought to correct the deficiencies identified. In March, 2008, Wyvill

4

announced a five-point plan which was designed to address issues identified at BSDC and to ensure the improvement and continued operation of the facility. Additionally, in April, 2008, Wyvill announced a six-point plan aimed to address staff recruitment and retention issues at BSDC. (Filing 59-5 at CM/ECF pp. 3-4.)

10. DHHS also executed several contracts in an effort to remedy the problems identified at BSDC. In December, 2007, DHHS contracted with Liberty Healthcare for consultation to assist with CMS compliance issues. (Filing 59-15 at CM/ECF pp. 1-8.) Further, in June, 2008, DHHS contracted with Guardian Healthcare Providers to obtain management staff at BSDC. (Filing 59-17 at CM/ECF pp. 12-24.)

11. On June 30, 2008, the United States Attorney General filed a complaint against the State of Nebraska and several of the States' officials, including Governor Heineman, Wyvill and Stegemann, for alleged violations of CRIPA arising out of the conditions at BSDC. *U.S. v. State of Nebraska, et al*., Case No. 8:08CV271, filing 1 at CM/ECF pp. 1-9 (D. Neb. 2008). The parties to the suit subsequently entered into a settlement agreement which was approved by this court on July 2, 2008. (*Id*. at filing 10.)

12. Pursuant to the settlement agreement, the defendants agreed to abide by and implement a plan and set of conditions designed to improve conditions at BSDC. However, in entering into the settlement agreement, the defendants expressly stated that they were not admitting that any constitutional or statutory violation, in fact, occurred. Moreover, the parties agreed that the settlement agreement could not be used as evidence of liability in any other legal proceeding. (*Id.*)

5

13. Following the execution of the settlement agreement, DHHS entered into additional contracts in an effort to improve conditions at BSDC. In October, 2008, DHHS contracted with the University of Nebraska Medical Center for additional psychiatric services for BSDC. (Filing 59-20 at CM/ECF pp. 1-12.) In November, 2008, DHHS contracted with James Bailey for support with physical and nutritional management in order to help serve the BSDC residents with Dysphasia challenges. (Filing 59-21 at CM/ECF pp. 1-12.) In December, 2008, DHHS contracted with Clinical Services Management, P.C. for executive leadership and consultation in relation to CMS and DOJ compliance issues. (Filing 59-22 at CM/ECF pp. 1-23.) In January, 2009, DHHS contracted with Guardian Healthcare Providers for physical therapy and speech language pathology services for BSDC residents. (Filing 59-17 at CM/ECF pp. 1-11.) That month, DHHS also contracted with JAToy and Associates to obtain a second opinion as to whether continued operation of BSDC was appropriate. (Filing 59-33 at CM/ECF pp. 1-8.)

14. On January 30, 2009, following the death of a BSDC resident, Dr. Schaefer informed Governor Heineman that she intended to invoke her authority to limit the BSDC license pursuant to Neb. Rev. Stat. § 71-446, and order that "medically fragile" residents be identified and transferred from BSDC within one week. (Filing 59-1 at CM/ECF pp. 3-4.)

15. On January 31, 2009, Dr. Schaefer entered an Order on Request for Temporary Limitations and Order for Immediate Removal ("Order") relative to the license of BSDC. The Order concluded that "medically fragile" persons receiving care or treatment at BSDC were in imminent danger of death or serious physical harm. Accordingly, the Order temporarily limited the license of BSDC to operate as an ICF-MR. The Order required the removal of "medically fragile" residents from the

facility by no later than 5:00 p.m. on Friday, February 6, 2009. (Filing 59-7 at CM/ECF pp. 1-2.)

16. The Order defined "medically fragile" as persons with conditions, including, but not limited to, active or uncontrolled seizure disorders, swallowing disorders, bowel impactions, tracheotomies and significant osteoporosis.[2] (*Id*.) The identification of supposedly "medically fragile" residents was done by the medical director at BSDC at the time, Dr. Alfred Harrington. (Filing 59-1 at CM/ECF p. 5.)

17. In total, forty-seven BSDC residents were deemed to be medically fragile, including Plaintiffs' protected persons. At various times between February 3 and February 6, 2009, Plaintiffs' protected persons were removed from BSDC and placed in other care facilities. The protected persons were moved with little, and, allegedly, with respect to a couple of residents, no advance notice to Plaintiffs.[3]

## DISCUSSION

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in

---

[2] Plaintiffs contend that "medically fragile" is not a diagnostic term and there is no such recognized medical diagnosis.

[3] The extent and degree of notice provided to Plaintiffs of their protected persons' transfer from BSDC remains a matter of debate between the parties. The evidence shows, however, that, at least in most cases, Plaintiffs received notice prior to the removal of their protected persons, albeit short. (Filing 74-10 at CM/ECF pp. 86-99; Filing 75-1 at CM/ECF pp. 1-4.)

the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### 1. § 1983 Claims

Plaintiffs seek relief under § 1983 for alleged violations of the equal protection, due process, and privileges and immunities clauses of the Fourteenth Amendment of the United States Constitution; the Civil Rights of Institutionalized Persons Act; the Federal Fair Housing Act; the ADA; the equal protection clause of the Nebraska Constitution and the Nebraska Developmental Disabilities Services Act. Defendants maintain that they are entitled to summary judgment on each of Plaintiffs' § 1983 claims because Congress has provided a comprehensive remedial scheme to address Plaintiffs' claims under Title II of the ADA. According to Defendants, the ADA's remedial scheme precludes a § 1983 claim based on violations of the ADA, and, additionally, bars the remainder of Plaintiffs' § 1983 claims because the other alleged rights violations are based on the same allegations as the ADA claim.

Defendants are correct that Plaintiffs cannot seek redress for alleged violations of the ADA through a § 1983 action. In *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999), the plaintiff brought a § 1983 action against several government officials in their individual capacities for alleged deprivations of rights under the ADA. The Eighth Circuit Court of Appeals concluded that the ADA's comprehensive remedial scheme barred the plaintiff's § 1983 claims against the officials in their individual capacities for ADA violations. The Court explained:

> Section 1983 provides a federal cause of action for plaintiffs to sue officials acting under color of state law for alleged deprivations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. It is well recognized that a plaintiff may use section 1983 to enforce not only rights contained in the Constitution, but also rights that are defined by federal statutes. An exception to this general rule exists when a comprehensive remedial scheme evidences a congressional intent to foreclose resort to section 1983 for remedy of statutory violations. Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive.

*Alsbrook*, 184 F.3d at 1010-11 (internal citations omitted). Thus, Plaintiffs' § 1983 claim based on alleged violations of the ADA must be dismissed.

Relying on another decision from the Eighth Circuit Court of Appeals, Defendants further argue that Plaintiffs' remaining § 1983 claims for alleged deprivations of constitutional and statutory rights are also precluded by the ADA's remedial scheme. In *Grey v. Wilburn*, 270 F.3d 607 (8th Cir. 2001), the plaintiff brought suit alleging that the Office of the Missouri Secretary of State and two of its employees violated the ADA and the Rehabilitation Act by denying his application for re-registration as a securities agent. The plaintiff also asserted a § 1983 claim for alleged violations of the equal protection clause resulting from the application denial. Citing *Alsbrook*, the Eighth Circuit Court of Appeals found that the plaintiff's § 1983 equal protection claim was precluded because it was predicated on the same general allegations as his ADA and Rehabilitation Act claims.

9

Defendants contend that under *Grey*, the remainder of Plaintiffs' § 1983 claims are barred because each of Plaintiffs' claims are based on the same allegations. Here, however, unlike the plaintiff in *Grey*, Plaintiffs have not asserted a separate cause of action directly under the ADA. Rather, Plaintiffs resorted to § 1983 to remedy alleged ADA violations. It does not appear to the court that Plaintiffs' remaining § 1983 claims are simply veiled attempts to enforce the ADA or, in other words, attempts to do indirectly what they could not do directly. See *Alsbrook*, 184 F.3d at 1005 n.8 (stating that government officials cannot be sued in their individual capacities under Title II of the ADA). Accordingly, Plaintiffs' remaining § 1983 claims will not be dismissed on this basis.

### 2. Qualified Immunity

Defendants are, however, entitled to summary judgment on each of Plaintiffs' remaining claims on the ground of qualified immunity. Qualified immunity protects government officials from damage liability unless their discretionary acts violated clearly established statutory or constitutional rights of which a reasonable person would have known. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, "to withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right." *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir. 1996). After a thorough review of the matter, the court concludes that Plaintiffs have not met this burden.

### A. Due Process

In *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1983), the United States Supreme Court recognized that mentally retarded individuals involuntarily committed to state custody have constitutionally-protected

liberty interests in adequate food, shelter, clothing medical care and conditions of reasonable care and safety. There appears to be disagreement among courts, however, as to whether *voluntarily* committed individuals, such as Plaintiffs' protected persons, also possess *Youngberg* due process rights. See *Torisky v. Schweiker*, 446 F.3d 438, 448 (3d Cir. 2006) ("We hold that the District Court erred in concluding that the state owes an affirmative due process duty of care to residents of a state institution who are free to leave state custody"); *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir.1995) (ruling that the state owed no duty to protect a voluntary resident of a state school for the deaf); *but see Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir. 1983) (holding that *Youngberg* rights extend to both voluntarily and involuntarily committed individuals). The court will not take the opportunity to address this issue here. See *Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995) (expressly declining to address the question of whether a voluntary mental patient enjoys the same due process protections as an involuntary patient). Even assuming that Plaintiffs' protected persons enjoy *Youngberg* rights, Plaintiffs' due process claims would fail.

"A substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir. 2004). "Mere negligence or even recklessness by a public official is not enough to shock the judicial conscience." *James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006). Where the official had time to deliberate before acting, the official's conduct will not be found to be conscience-shocking unless the official acted with deliberate indifference. *Id*. Deliberate indifference will be found only if the officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and the officials actually drew that inference. *Moore*, 381 F.3d at 773-74.

Viewing the facts most favorably to Plaintiffs, it cannot be said that Defendants' acts so shock the conscience as to constitute a substantive due process violation. Plaintiffs contend that Defendants, acting in concert, purposefully allowed

11

conditions at BSDC to deteriorate and then, rather than fixing the problems at the facility, moved their protected persons from BSDC with little or no advance notice.[4]

---

[4] The court construes each of Plaintiffs' complaints as not complaining of the conditions at BSDC in and of themselves, as all parties acknowledge that BSDC was having problems complying with state and federal standards. Rather, Plaintiffs' complaints allege that Defendants, acting in concert, formulated a plan designed to allow conditions at the facility to deteriorate with the *objective* of moving Plaintiffs' protected persons. The first amended complaint in Case No. 8:09cv157 states: "Under conditions violative of the protected persons' rights, the Defendants caused, or permitted, BSDC to deteriorate so dramatically as to determine and declare, themselves, it was no longer safe, fit, or suitable for the Plaintiffs' wards. Instead of fixing the facility . . . Defendants permitted the wards' rights to be trampled upon by moving them without warning and without alternatives being provided. This is tantamount to a corn farmer letting the weeds grow so he can file a crop loss claim." (Filing 19, Case No. 8:09CV157 at CM/ECF p. 8.) The first amended complaint continues stating that "[t]he Defendants seek to shut down BSDC and chose, as a method to accomplish this goal, the deterioration of the facility . . ." (*Id*. at pp. 14-15.) Plaintiffs further allege that "the Defendants set out to trample on [the protected persons'] legal rights to achieve their objective to close the BSDC . . ." (*Id*. at p. 16.) The complaints in Case Nos. 4:10cv3020 and 4:10cv3021 contain similar allegations. (Filing 1, Case No. 4:10CV3020 at CM/ECF pp. 10, 13 ; Filing 1, Case No. 4:10CV3021 at CM/ECF pp. 10, 13.)

Moreover, the only damages alleged to have been suffered by Plaintiffs and their protected persons purportedly stem from the transfers from BSDC. There are no allegations in the complaints, and Plaintiffs point to no evidence, that Plaintiffs' protective persons were *themselves* abused, neglected or harmed by the conditions existing at BSDC prior to the transfers. Instead, the wrongful acts alleged in these consolidated actions are that Defendants purposefully allowed the facility to deteriorate which harmed the protected persons because they suffered adverse health consequences as a result of no longer being able to reside at BSDC. Evidence submitted by Plaintiffs support this conclusion. In testimony before the Nebraska Developmental Disabilities Special Investigative Committee on August 21, 2008, Plaintiff, Joan O'Meara testified: "My daughter has been at BSDC for 44 years–a place she calls home. She is happy, safe, and well cared for by dedicated and well-trained staff. There is a doctor, dentist, nurses, dietician,

There is no evidence, however, to support such a conspiracy between Defendants. To the contrary, the evidence of record shows that Defendants did, in fact, take measures to remedy the conditions at BSDC. In March, 2008, Wyvill announced a five-point plan designed to address issues identified at BSDC and to ensure the improvement and continued operation of the facility.[5] Additionally, in April, 2008, Wyvill announced a six-point plan aimed to address staff recruitment and retention issues at BSDC.[6] (Filing 59-5 at CM/ECF pp. 3-4.) Wyvill and DHHS also worked with multiple consulting firms to assist with CMS and DOJ compliance issues. (Filing 59.)

When it became clear that the efforts being made to resolve the issues at BSDC were proving insufficient to care for some of BSDC's residents, Dr. Schaefer acted pursuant to her statutory authority to limit the license of BSDC and caused the immediate removal of some of its residents. There is no evidence that any of the other Defendants influenced or encouraged Dr. Schaefer to take this action or that Dr. Schaefer was acting in anyway but good faith, seeking only to ensure the safety of residents deemed to have special needs. While arguably more steps could have been

---

psychiatrist, psychologist, a physical therapist, all on staff. She and I have the right of choice to live at BSDC." (Filing 74-6 at CM/ECF p. 4.)

[5] The five points were (1) increasing staffing to eliminate mandatory overtime; (2) implementing integrated community-based care plan; (3) enhancing client care and safety; (4) reallocating funding to implement community-based care and (5) communicating with families, guardians, stakeholders, elected officials and communities to fully inform and engage them. (Filing 59-8 at CM/ECF p. 1.)

[6] The six points were (1) referral incentives for current BSDC staff; (2) recruitment/retention incentive to new staff; (3) performance incentives to current staff; (4) hiring a full-time new employee orientation facilitator for one year, with a possible extension; (5) hiring four full-time mentor/buddy positions to coach, mentor and train new employees and (6) continuing temporary staffing, possibly through August, 2008. (Filing 59-5 at CM/ECF p. 4.)

taken to improve conditions at BSDC, or, perhaps, slightly more notice of the residents' transfers could have been given, Defendants' actions do not constitute the type of deliberate indifference which constitutes a substantive due process violation. This is not a situation in which state officials simply did nothing to alleviate identified problems. Moreover, there is no evidence that Defendants purposely failed to implement a particular remedial measure.

Plaintiffs also cannot establish that Defendants violated any clearly established procedural due process rights. Plaintiffs contend that they were denied procedural due process when Defendants transferred their protected persons from BSDC without providing Plaintiffs advance notice or the opportunity to be heard concerning the best interests of their protected persons. The evidence shows that in January, 2009, following the death of a BSDC resident, Dr. Schaefer directed her licensing staff to review the conditions at BSDC. (Filing 59-1 at CM/ECF pp. 3-4.) Based on the review, Dr. Schaefer concluded that removal of residents deemed to have complex medical needs was necessary. Accordingly, on January 30, 2009, Dr. Schaefer ordered that "medically fragile" residents be identified and transferred from BSDC within one week. (*Id.*) Dr. Alfred Harrington, the Medical Director at BSDC at the time, made the determination with regard to the identification of "medically fragile" residents. (Filing 59-1 at CM/ECF p. 5.)

Assuming that the residents had a right to a hearing prior to their removal from BSDC, it cannot be said that in failing to provide such a hearing, Dr. Schaefer, or any of the other Defendants, violated a clearly established constitutional right of which a reasonable person would have known. In ordering the removal of residents, Dr. Schaefer was acting within the scope of authority granted to her by Neb. Rev. Stat. § 71-446, which provides:

> If the director determines that persons receiving care or treatment at a health care facility or by a health care service are in imminent danger of death or serious physical harm, he or she may temporarily suspend or

14

> temporarily limit the license of such facility or service and may order the immediate removal of such persons and the temporary closure of the facility or service pending further action by the department. The department shall also simultaneously institute proceedings for revocation, suspension, or limitation of the license. A hearing shall be held no later than ten days after the date of such temporary suspension or temporary limitation.

Neb. Rev. Stat. § 71-446(1). There is no indication that Dr. Schaefer acted in bad faith in implementing the statute or that Dr. Schaefer's decision to remove Plaintiffs' protected persons was part of a ploy to avoid responsibility for complying with state or federal care standards. Further, there is no indication that Dr. Schaefer had any reason to question the statute's lawfulness or constitutionality. *See Swanson v. Powers*, 937 F.2d 969, 969 (4th Cir. 1991) (stating that "[r]arely will a state official who simply enforces a presumptively valid state statute thereby lose her immunity from suit.").

Moreover, in light of the information Dr. Schaefer possessed, her decision to limit BSDC's licensure scope and order the immediate removal of residents having complex medical needs was objectively reasonable. In fact, if Dr. Schaefer had not invoked her statutory authority to limit the scope of BSDC's license, and harm had consequently come to one of BSDC's residents, it is quite possible that Dr. Schaefer would have faced a different lawsuit. As previously noted by the Eighth Circuit, "[i]t is precisely this type of damned if you do, damned if you don't, discretionary decision-making on the part of government officials that the doctrine of qualified immunity was meant to protect." *Omni Behavioral Health v. Miller*, 285 F.3d 646, 655 (8th Cir. 2002) (quoting *Callahan v. Lancaster-Lebanon Intermediate Unit 13*, 880 F. Supp. 319, 339 (E.D. Pa. 1994)).

While the amount of advance notice of the residents' removal from BSDC may have been minimal, in the one week period from the issuance of Dr. Schaefer's order and the time of removal, it is apparent that at least some attempts were made to

15

contact Plaintiffs. Further, it is clear that Dr. Schaefer believed that swift action was necessary in order to protect the safety of the residents. Accordingly, Dr. Schaefer's decision to quickly remove residents deemed to be at greatest risk was reasonable under the circumstances. The "linchpin of qualified immunity is the objective reasonableness of the officer's actions." *Wilson v. Spain,* 209 F.3d 713, 716 (8th Cir. 2000). "[Q]ualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and the information [that the defendant] possessed.'" *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034 (1987)). Based on the facts presented, Defendants are entitled to qualified immunity.

### B. Discrimination Claims

Plaintiffs claim that Defendants' actions were discriminatory and violated rights under the federal and state equal protection clauses, the Nebraska Developmental Disabilities Services Act, Neb. Rev. Stat. § 83-1201, *et seq.*, and the Federal Fair Housing Act, 42 U.S.C. § 3604(f). In support of these claims, Plaintiffs again allege that Defendants concocted a plan to allow BSDC to deteriorate so that they could simply transfer Plaintiffs' protected persons from the facility, rather than improve conditions at BSDC. Plaintiffs further contend that Defendants invented the term "medically fragile" as a pretext for removing Plaintiffs' protected persons from BSDC. The evidence refutes these allegations.

There is no dispute that BSDC was having problems complying with state and federal care standards and, consequently, was the subject of a settlement agreement wherein the defendants agreed to implement a plan and set of conditions designed to improve conditions at BSDC. However, there is no evidence that Defendants purposefully failed to implement any specific remedial measure or that Defendants otherwise sought to discriminate against Plaintiffs' protected persons. Moreover, Plaintiffs point to no evidence showing that Plaintiffs' protected persons themselves

16

were abused, neglected or failed to receive proper care on any particular occasion prior to their transfer or that any Defendant took (or failed to take) any specific action causing harm to Plaintiffs' protected persons prior to their move. Additionally, there are no facts indicating that the term "medically fragile" was invented for the purpose of discriminating against Plaintiffs' protected persons. Rather, it is apparent that the term was merely used to identify and/or describe a class of residents who were, at that time, thought to be in danger by continued residency at BSDC.

With respect to their Federal Fair Housing Act ("FFHA") claim, Plaintiffs argue that Defendants failed to reasonably accommodate their protected persons in violation of § 3604(f)(3)(B) of the Act. The FFHA requires accommodation for persons with handicaps if accommodation is reasonable and necessary to afford handicapped individuals an equal opportunity to use and enjoy housing. *Developmental Services of Nebraska v. City of Lincoln*, 504 F. Supp.2d 714, 723 (D. Neb. 2007). To establish a prima facie case for failure to accommodate under the FFHA, the plaintiff is required to show that (1) he suffers from a handicap, (2) the defendants knew of the handicap, (3) accommodation of the handicap may be necessary to afford the plaintiff an equal opportunity to use and enjoy a dwelling and (4) the defendants refused to make such accommodation. *In re Kenna Homes Co-op Corp.*, 557 S.E.2d 787 (W. Va. 2001).

As explained previously, Defendants took steps, although purportedly insufficient, to remedy the conditions at BSDC. There is no evidence that Defendants outwardly refused to accommodate Plaintiffs' protected persons, nor is there evidence of any specific accommodation that Defendants refused to make despite being requested to do so by Plaintiffs. The fact that Plaintiffs' protected persons were transferred from BSDC following allegedly ineffective remedial measures does not evidence a desire to avoid accommodating Plaintiffs' protected persons. Rather, it only demonstrates that Defendants desired to prevent harm to residents with complex medical needs. In light of the information they possessed and the circumstances presented, Defendants' actions were objectively reasonable.

### C.     *Civil Rights of Institutionalized Persons Act*

Plaintiffs also appear to bring a § 1983 claim under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. CRIPA is a standing statute which permits the United States Attorney to institute suit when he has cause to believe that institutionalized persons are being subjected to conditions which violate their constitutional rights. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 507-08, 102 S.Ct. 2557, 2563, 73 L.Ed.2d 172 (982). CRIPA does not authorize private causes of action and does not create any new substantive constitutional rights. *See Lor v. Commonwealth of Pennsylvania*, No. CIV. A. 99-4809, 2000 WL 186839, at *3 (E.D. Pa. Feb. 4, 2000) ("CRIPA creates no new substantive rights but rather merely gives the Attorney General standing to sue on behalf of institutionalized individuals to ensure that their constitutional rights are protected.") Therefore, Plaintiffs' claim based on alleged violations of CRIPA will be dismissed.

Accordingly,

IT IS ORDERED:

1. Defendants' motion for summary judgment (Filing 55, Case No. 8:09CV157; Filing 26, Case No. 4:10CV3020; Filing 25, Case No. 4:10CV3021) is granted;

2. Defendants' motion to strike (filing 77, Case No. 8:09CV157; filing 49, Case No. 4:10CV3020; filing 48, Case No. 4:10CV3021) is denied as moot;

3. Judgment in each of these consolidated actions will be entered by separate document.

January 10, 2011.

BY THE COURT:

*Richard G. Kopf*
United States District Judge

---

\* This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.